

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00036-CV
_____

IN THE MATTER OF D.O.R., A JUVENILE

On Appeal from the County Court at Law
Cass County, Texas
Trial Court No. 14-J-009

Before Morriss, C.J., Stevens and Marion,* JJ.
Memorandum Opinion by Justice Stevens

_____

*Sandee Marion, Chief Justice, Retired, Sitting by Assignment

MEMORANDUM OPINION

On January 9, 2015, D.O.R.[1] pled true to and was adjudicated by the trial court for delinquent conduct after he committed capital murder. The trial court committed D.O.R. to the Texas Juvenile Justice Department (TJJD) for a determinate sentence of twenty-five years. Although D.O.R. made some efforts to do the right things during his time with the TJJD, the trial court transferred his case to the Texas Department of Criminal Justice (TDCJ) so that D.O.R. could serve the rest of his sentence.

On appeal, D.O.R. argues that (1) the trial court abused its discretion when it transferred him to the TDCJ and (2) the clerk's record had no pleading or document by which the TJJD referred the case to the juvenile court. Because we find that the evidence supported the trial court's ruling and that the juvenile court received notice from the TJJD of a need for a release or transfer hearing, we affirm the trial court's transfer order.

## I.      The Trial Court Did Not Abuse Its Discretion in Transferring D.O.R. to the TDCJ

### A.      Standard of Review

"Where a juvenile has been adjudicated and committed to TJJD and subsequently is transferred to TDCJ[], we review the trial court's order for an abuse of discretion." *In re M.C.*, 502 S.W.3d 852, 854 (Tex. App.—Texarkana 2016, pet. denied) (citing *In re T.D.H.*, 971 S.W.2d 606, 610 (Tex. App.—Dallas 1998, no pet.)). "In determining whether the trial court abused its discretion, we review the entire record to determine if the trial court acted arbitrarily, unreasonably, or without reference to any guiding principles or rules." *In re A.C.*, No. 10-14-00364-CV, 2015 WL 6437696, at *1 (Tex. App.—Waco Oct. 22, 2015, no pet.) (mem. op.)

---

[1]We may use initials or pseudonyms to protect the juvenile's identity. *See* TEX. R. APP. P. 9.8.

(citing *In re D.L.*, 198 S.W.3d 228, 229 (Tex. App.—Dallas 2006, pet. denied)).  "The trial court's decision will be upheld if the record contains some evidence to support it."  *Id.* (citing *In re N.K.M.*, 387 S.W.3d 859, 864 (Tex. App.—San Antonio 2012, no pet.)).

Under the Texas Human Resources Code, a juvenile serving a determinate sentence for a capital offense must serve at least ten years of his sentence in the TJJD.  TEX. HUM. RES. CODE ANN. § 245.051(c)(1).  Yet, "[o]nce a juvenile attains the age of nineteen, the TJJD loses control over that juvenile."[2]  *M.C.*, 502 S.W.3d at 855 (citing TEX. HUM. RES. CODE ANN. § 245.151(e)).  "Because of [D.O.R.'s] determinate sentence, the trial court could either release [him] to parole under TDCJ[]'s supervision or transfer him to TDCJ[] for continued confinement."  *Id.*  "[A] transfer/release hearing conducted under Section 54.11 is a 'second chance hearing' that gives juveniles—who have previously been sentenced to a determinate number of years—a second chance to persuade the court that they should not be imprisoned."  *In re A.V.*, No. 11-18-00135-CV, 2020 WL 2836432, at *2 (Tex. App.—Eastland May 29, 2020, no pet.) (mem. op.) (quoting *In re D.L.*, 198 S.W.3d 228, 230 (Tex. App.—San Antonio 2006, pet. denied)).

In deciding whether to transfer a juvenile to the TDCJ,

> the court may consider the experiences and character of the person before and after commitment to the Texas Juvenile Justice Department or post-adjudication secure correctional facility, the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed, the abilities of the person to contribute to society, the protection of the victim of the offense or any member of the victim's family, the recommendations of the Texas Juvenile Justice Department, county juvenile board, local juvenile probation department, and prosecuting attorney, the best interests of the person, and any other factor relevant to the issue to be decided.

---

[2]D.O.R. had been at the TJJD for about five years before his nineteenth birthday.  Thus, he had not completed the ten-year minimum period of confinement.

*M.C.*, 502 S.W.3d at 856–57 (quoting TEX. FAM. CODE ANN. § 54.11(k)). "Within its discretion, the trial court may assign different weights to the factors it considers, and the court need not consider every factor." *In re H.C.*, No. 02-15-00149-CV, 2016 WL 354297, at *2 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.).

### B. Evidence Presented

At the second-chance hearing, there was adequate evidence to support the trial court's decision to transfer D.O.R. to the TDCJ. First, Jay Womack, a Texas Ranger employed by the State of Texas,[3] testified that, in June 2014, he was called by Cass County Sheriff's Department Chief Deputy Roy Barker, asking him to investigate the murders of David Rankin (David) and Terry Rankin (Terry).[4] Womack was first told that D.O.R. said that David shot Terry and that D.O.R. was able to get the gun away from David and shoot David.[5] When he arrived at the scene, Womack saw a man dressed in boxer shorts laying on his back in the kitchen.[6] Womack stated that there was blood around the dining room and in the kitchen area. Womack also saw a child,[7] dressed in short pants and a shirt, laying on the floor in the hallway that goes into the dining room.[8] Womack reviewed photographs of D.O.R. that showed a wound on his arm.

---

[3] Womack has since retired from the Texas Rangers.

[4] Womack estimated that he had investigated "probably over 100" homicide cases, but this case was the only one that involved a juvenile murdering his parent.

[5] Similarly, D.O.R. told the 9-1-1 operator that David shot Terry, and then D.O.R. shot David.

[6] This victim was identified as David and is D.O.R.'s adoptive father and his step-grandfather.

[7] This victim was identified as Terry and is D.O.R.'s biological brother.

[8] Womack described several photographs taken at the scene.

4

According to Womack, D.O.R.'s wound did not look like a defensive wound but, instead, had probably been self-inflicted.

Womack had a chance to listen to part of the 9-1-1 call that D.O.R. made after the shootings. Womack said that D.O.R. sounded calm and "monotone," which in his opinion, was unusual because most 9-1-1 callers who just shot someone sound "upset." "It's a traumatic event for anybody." Womack testified that D.O.R. did not sound remorseful during the 9-1-1 call and testified, at one point, that D.O.R. was "trying to play the hero like, I shot my dad because he shot my little brother." According to Womack, a few months later, D.O.R. confessed to a family member that he had shot both David and Terry. The family member relayed the information to the police, and upon its receipt, an arrest warrant was issued for D.O.R. In Womack's opinion, he did not believe that five and a half years in TJJD was sufficient punishment for D.O.R., stating, "I think there should be additional time." Womack also testified that, based on his experience in law enforcement, people who commit violent crimes generally become repeat offenders.

Alanna Bennett, a court liaison for TJJD, explained that she attended juvenile hearings and also relayed the juvenile justice system's recommendations on determinate sentences. Bennett testified that D.O.R. had a history of having ADHD and that he needed psychiatric services but that his main treatment need was for violent offending because of his offense. Bennett explained the different treatment levels available to juvenile offenders and that D.O.R. had completed the Violent Offender Program. Following the completion of that program, D.O.R. entered the Capital and Serious Violent Offender Treatment Program (Program), which is typically done closer to the time of a juvenile's release. Bennett testified, "That program is very

intense. It is done with treatment providers, psychologists, and we deal with role playing. And, you know, we go deeper into life story."

Bennett also explained the "Stages" that the juveniles go through during their confinement in the TJJD, beginning with Stage One and culminating in the "Stage YES" program. According to Bennett, D.O.R. was "moving right along in the program[s]." Bennett said that, while D.O.R. was waiting to begin the Program, he became antsy, aggressive, irritated, and aggravated with the staff. During his time in the TJJD, D.O.R. had nine behavior incidents,[9] none of which were major, and six referrals to the regulations and safety unit. Bennett explained that D.O.R. had not had any behavioral incidents since 2015. D.O.R. earned his G.E.D. in August 2017, and he earned vocational certificates as well. In addition, D.O.R. participated in several off-campus programs, including equine-assisted therapy.

Bennett then explained that, during a juvenile's confinement, the TJJD must decide whether to recommend parole for a juvenile by using a set of guidelines and requirements. Bennett testified that D.O.R. did not meet the necessary requirements for parole. Yet, she made a recommendation to the trial court that D.O.R. be paroled. That said, because Bennett was concerned about D.O.R. going back home to live with his adoptive mother, she recommended that he reside in a halfway house. She also recommended that D.O.R. be placed on the highest level of supervision for at least one year. According to Bennett, the recommended supervision basically involved meeting with a parole officer, working, and completing counseling, all while on a very strict schedule. She also said that TDCJ parole did not have to follow her recommendations.

---

[9]Bennett said that the referrals for unacceptable behavior were for "horse playing and things of that nature."

6

Danuta Godlewski, a psychologist for the TJJD during the relevant period,[10] testified that she prepared evaluations and recommendations relating to eligibility for parole and that she conducted group and individual counseling sessions with the juveniles at the TJJD. Godlewski explained that, after interviewing D.O.R. for two days, she completed her psychological evaluation.[11] During her interview with D.O.R., Godlewski learned that D.O.R. had been adopted when he was about four years old. D.O.R.'s adoptive mom, who was also his grandmother, was employed as a nurse, went to school when she was not working, and had a substance abuse problem. D.O.R. reported that he did not have the best relationship with his adoptive father, David, who was also D.O.R.'s step-grandfather and one of the victims in this case. Godlewski said that D.O.R. did not recall the family having financial problems nor was he subjected to neglect or sexual abuse. Even so, D.O.R. told Godlewski that he was physically abused, explaining that David "whooped" him and pushed him into walls. D.O.R. also said that he was verbally abused, receiving threats from David of continued "whoopings" and threats of aggression. As far as Godlewski knew, there had been no domestic violence in the home and child protective services had never been contacted. D.O.R. told Godlewski that he had a good relationship with his adoptive mother.

Godlewski also noted that, when she spoke with D.O.R., he did not "verbalize the escalating nature of his homicidal ideation and corresponding anger as would have been expected." Godlewski explained that, after she had reviewed D.O.R.'s records, she learned that he had discussed the details of the offenses in group therapy with his group therapist, but when

---

[10]At the time of the hearing, Godlewski had a different position with the TJJD.

[11]A copy of D.O.R.'s evaluation was admitted into evidence.

she met with him, D.O.R. only gave a brief description of the offenses. In Godlewski's opinion, D.O.R. should have been able to discuss what happened at the time of the offenses.[12] Moreover, according to Godlewski, D.O.R. had a moderate or a high degree of risk factors relating to potential recidivism. Godlewski also explained that, if D.O.R. continued to work on the skills he had learned during his treatment, he could decrease the risk factors, but if he chose not to do so, the risk factors would increase.

Along with Godlewski's testimony, there were several staffing notes, treatment notes, quarterly progress reports, and case plans entered into evidence. A review of those documents showed a somewhat mixed review of D.O.R.'s progress about his mental and emotional health, as well as his ability to socialize with others.[13] A May 3, 2019, report included a comment from one of D.O.R.'s mentors that D.O.R. "scared them to the core." In the same report, his mentor expressed concerns about D.O.R.'s desire to join the "Wiccan faith," telling his mentor that "he thinks that he will think less about murder by becoming Wiccan."[14]

On the other hand, there was evidence in the record to show that D.O.R. had several successes during his confinement. First, D.O.R. received his G.E.D. while in the TJJD. He also applied to, and was accepted by, two community colleges for the 2020 fall term. Also in the

---

[12]Later, during the hearing, D.O.R. explained how the offenders in his therapy group acted out their offenses, either by playing a role as the perpetrator or the victim, or by watching the others play a role. D.O.R. said, "It is supposed to help us understand because it's -- in my case there was the denial and other people's case there's denial."

[13]The notes seem to suggest that D.O.R. did worse during the initial part of his confinement in the TJJD and was doing better as time passed. Most of D.O.R.'s issues related to anger management; however, D.O.R. requested counseling to work on his issues.

[14]D.O.R. testified that he did not recall saying that he wanted to be a member of the Wiccan faith. According to D.O.R., he did not have enough confidence or trust in the counselor to tell him something like that. "If I -- I may have said it. I don't remember."

record is a letter from Sydney Kubeczka, an academic counselor at Giddings State School, which

stated, in part,

> [D.O.R.] is an outstanding person, student, and role model. He exemplifies everything we want students to accomplish during their time here. He has the highest stage possible, holds an officer position on the Student Council, is in athletics, obtained his GED[,] has vocational certifications, and holds a job on campus.
>
> . . . .
>
> I strongly and firmly believe, if [D.O.R.] was given the opportunity to have a life of freedom, he would not disappoint. He has supportive factors at home to achieve what it is he wants to achieve in this world, and I plan to continue to support [D.O.R.] with any college needs he has that arise upon his departure.

Lastly, D.O.R. testified that he pled true to the murders of his adoptive father and his

brother and that, although he had not taken responsibility in the beginning, he had since done so.

D.O.R. explained that, before calling 9-1-1 to report the incident, he drove to his biological

mother's house and told her what he had just done. D.O.R. said, "When I told them what

happened, [biological mother's] boyfriend came up to me and told me, 'Look, do this.' He told

me what to do to stage the crime.[15] I looked at my mother to see if she agreed with it or not.

She didn't say anything." D.O.R. continued, "So when [my biological mother's boyfriend] got

done talking to me, I drove back to the house and I did it -- I staged the crime as he said to." By

that time, D.O.R. had calmed down and placed a call to 9-1-1. D.O.R. said he never told the

police that his biological mother's boyfriend told him to stage the crime scene "[b]ecause [he]

knew that they could be charged with accessory for aiding and abetting." According to D.O.R., a

---

[15]D.O.R. said that he cut his arm with a knife and placed it in David's hand to make it look like David had attacked Terry.

9

few months later, he told a family member that he had killed David and Terry. D.O.R. said that he regretted staging the scene and that he knew that there was no excuse for what he had done.

It also had been documented in D.O.R.'s 2018 case notes that he had been having violent fantasies about killing people, but D.O.R. said that his psychologist taught him how to work through the fantasies and that, as a result, he no longer had them. According to D.O.R., if the court were to release him on parole, his grandmother and his uncle would be his primary support system. D.O.R. said he would be willing to live in a halfway house if the trial court determined that he should be released on parole. Likewise, D.O.R. understood that, if he were released, he would have to wear an ankle monitor, be on house arrest, have a parole officer, and participate in counseling. D.O.R. said that he would comply with all the recommended conditions and that he could go forward with his life in a positive manner. When he was asked if he could guarantee the court that he would never commit such an egregious offense, D.O.R. said, "To the fullest -- to the full human extent, yes, sir, I can."

On cross-examination, D.O.R. testified that he had been held in the Cass County Jail for the last couple of months and that he had adjusted "somewhat." D.O.R. said that, during his time there, he played cards, watched television, and read books, mostly science fiction and "post-apocalyptic, like zombie apocalypse type thing[s]." D.O.R. conceded that some books he read were violent and involved killing. D.O.R. said that, before his confinement, he enjoyed playing video games, most of which were considered violent. D.O.R. explained, "It is not reality. And I am not -- I -- you know, I don't think like, okay, this is cool. It's entertaining but it's not, oh, like, this is cool to do." Yet, D.O.R. agreed that reading about violence or watching it on video

games "could trigger something in [his] head." He later clarified that any fantasies he may have had in 2019 related to fighting, not killing someone.

### C. Analysis

The record and the trial court's findings and conclusions were sufficient to allow us to conduct our review and conclude that the trial court did not abuse its discretion in rendering its judgment. Following the hearing on the matter, the trial court orally detailed its considerations in reaching a decision. Among the trial court's findings:

- D.O.R. and David did not have a good relationship and it was marred by physical discipline, either appropriate or not.

- D.O.R. carefully planned the murders by acquiring a weapon and waiting for the appropriate opportunity.

- D.O.R. "was motivated by anger either justified or not justified at his adoptive father" when he committed the murders.

- D.O.R. purposefully shot Terry in the back, and then walked up to him and shot him in the head while he was lying on the floor in a helpless condition.

- D.O.R. shot Terry the second time in order "to eliminate any witnesses."

- D.O.R. successfully covered up the murder from law enforcement and the trial court.

- D.O.R.'s actions in shooting the victims twice "shows that he was on all levels capable of some serious cold-blooded criminal planning, thinking and execution."

- The offenses that D.O.R. committed were capital offenses, and the trial court described them as "execution[s]."

- After his commitment to the TJJD, it appeared that D.O.R.'s conduct was favorable, and the TJJD recommended that D.O.R. be placed on adult parole, with a leg monitor.

- Although D.O.R. testified that he had plans to contribute to society if he were released on parole, his plans were speculative.

11

- David and Terry were no longer able to contribute to society, but society should be protected in general.

- The court did not believe D.O.R. would hurt his adoptive mother/grandmother, "[b]ut it's too late to protect the real victims which are the two deceased persons."

- In the event D.O.R. was required to serve his full sentence, he would only be in his thirties at the time of his release.

- As to the issue of punishment, the trial court stated, "The bottom line is whether five years [sic] incarceration for someone who murdered two family members in cold blood is adequate punishment. In the mind of the Court, it is not."

- In referencing the best interest factor, the trial court stated,

  If that was the only factor, it would weigh heavily on release. The Court recognizes that if the training he's had at the Texas Juvenile Justice Division has been effective, if he has mastered his anger issues which apparently were overwhelming at some point, if he's capable of changing his former criminal thinking which was clearly what led him to commit these offenses, then he would be better off for his release. But the question I have is, would society. Society's protection is a fact, must also and always weigh heavily with the Court. Those "ifs" that I mentioned are some pretty large "ifs" for someone who has shown himself to be at least capable of committing a double murder. And those are chances this Court is not willing to take.

- The trial court was not bound to follow the recommendation of the TJJD.

In making the determination that D.O.R. should be transferred to the TDCJ, the trial court considered (1) the recommendation and written reports from the TJJD, (2) the notes from therapists and individuals working with D.O.R., (3) D.O.R.'s character both before and after his commitment to TJJD, (4) the manner in which the offense was committed, (5) D.O.R.'s ability to contribute to society, and (6) protection of the family and society in general. The record supports each of the trial court's findings. The findings and considerations mirror those suggested in the Texas Family Code's statute pertaining to the release of a juvenile from a TJJD commitment or the transfer of the juvenile to the TDCJ. Comparing the trial court's findings with the statute's

12

suggested considerations, we find the trial court clearly made its decision with reference to guiding rules and principles as contained in the Texas Family Code. Thus, the trial court did not abuse its discretion in making its ruling.

We overrule D.O.R.'s first point of error.

## II. D.O.R. Received Fair and Adequate Notice of the 54.11 Hearing

D.O.R. seems to argue, among other things, that, because he did not get a written notice from the TJJD on the Section 54.11 hearing, he was deprived of due process, which he contends was fundamental error. According to D.O.R., "The [c]lerk's [r]ecord does not contain any pleading or document by which TJJD referred the case to the juvenile court." The State contends, among other things, that D.O.R waived the issue because he did not bring the alleged error to the trial court's attention.

The record shows that, on March 16, 2020, the trial court issued an order appointing D.O.R. counsel and setting a hearing on April 24, 2020, at 9:00 a.m. to determine whether D.O.R. would be released on parole or transferred to the TDCJ. The trial court's order stated, "It has been **brought to the attention of the Court** that a request has been received from the Texas Juvenile Justice Department for the Court to conduct a release or transfer hearing as provided by Section 54.11 of the Texas Family Code concerning [D.O.R.]." (Emphasis added). Thus, the record shows that the trial court received some manner of request from the TJJD as shown by the court setting a release or transfer hearing on April 24, 2020, and then resetting the hearing for June 12, 2020.[16] Moreover, the trial court's docket shows that the parties appeared for both

---

[16]The trial court's docket shows that the initial hearing was reset under the Texas Supreme Court Emergency Orders Regarding the COVID-19 State of Disaster.

13

hearings, demonstrating that they knew about the TJJD's requests for hearings and that they knew the date, time, and place where the hearings would occur.

To the extent that D.O.R. complains that the TJJD did not provide him with a written request for a release or transfer hearing, D.O.R. has waived that issue. To preserve error for appellate review, (1) the complaining party must make a timely objection specifying the grounds for the objection, if the grounds are not apparent from the context; (2) "[t]he objection must be made at the earliest possible opportunity"; and (3) "[t]he complaining party must obtain an adverse ruling from the trial court." *Dixon v. State*, 2 S.W.3d 263, 265 (Tex. Crim. App. 1998). Here, D.O.R. concedes that he failed to make an objection to the trial court on the lack of a written request. Yet, he argues that it was fundamental error that he did not receive a written request in the form of a pleading and therefore no objection was required. We disagree.

This Court has previously explained:

> In *Marin v. State*, the Texas Court of Criminal Appeals noted that there are three categories of rights: (1) forfeitable rights; (2) waivable rights; and (3) non-waivable rights. *Marin v. State*, 851 S.W.2d 275, 279–80 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997). The Court of Criminal Appeals held that most rights are forfeitable. *Id.* at 278. On the other hand, "[r]ights which are waivable only, as well as absolute systemic requirements and prohibitions, cannot be made subject to rules of procedural default because, by definition, they are not forfeitable." *Id.* at 279. Fundamental errors are trial errors which implicate non-forfeitable rights. Since such rights are non-forfeitable, they cannot be forfeited on appeal by failing to lodge a trial objection to their violation at trial.
>
> Different characterizations of fundamental error have been offered.[17] Yet, no consistent definition has emerged. Essentially, the cases declaring certain

---

[17]*See Hensarling v. State*, 829 S.W.2d 168, 173 (Tex. Crim. App. 1992) (Maloney, J., dissenting) (asserting that error is fundamental when "the alleged error is such that it calls into question whether the accused received a fair and impartial trial and 'implicates the due course of law clause of the Texas Constitution[]'"); *Smith v. State*, 463 S.W.3d 890, 901 (Tex. Crim. App. 2015) (Yeary, J., dissenting) (asserting that, "[i]f . . . Appellant's claim really does fall within *Marin*'s category one—if society simply will not tolerate a conviction under a penal statute that has

14

errors to be fundamental constitute judgment calls that the right in question is so important that any alleged violation of the right should never escape appellate review. *See* 43A George A. Dix, et al., *Texas Practice Series: Criminal Practice & Procedure*, § 53:135 (suggesting that "[a] right should be held to be fundamental only if, balancing all relevant considerations, recognizing it when raised for the first time on appeal sufficiently serves important enough interests to outweigh the cost paid by dispensing with the need for a trial objection"). While there is no settled definition of fundamental error, it may be observed that many of the errors which have been declared fundamental threaten a right which is essential to the proper functioning of a fair and impartial trial. *See Marin*, 851 S.W.2d at 278 ("Some rights are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system.")

---

been judicially declared unconstitutional on its face—then Appellant will be permitted to raise his complaint for the first time in . . . habeas corpus proceedings"); *Ieppert v. State*, 908 S.W.2d 217, 220 (Tex. Crim. App. 1995) (asserting that fundamental error was shown because "the constitutional prohibition against *ex post facto* legislation is not an individual right at all . . . " and "the people may not waive this prohibition, either individually or collectively, any more than they may consent to be imprisoned for conduct which does not constitute a crime"); *Aldrich v. State*, 104 S.W.3d 890, 896 (Tex. Crim. App. 2003) (Holcomb, J., dissenting) (asserting that fundamental error was shown because "the . . . errors . . . were . . . of the type that could generate public disrespect or suspicion regarding the fairness and accuracy of judicial proceedings"); *Saldano v. State*, 70 S.W.3d 873, 893–94 (Tex. Crim. App. 2002) (Johnson, J., dissenting) (asserting that error was fundamental where the testimony in question "violated some of the most fundamental principles of our legal system" and that "it is impossible to determine to what extent" the error "influenc[ed] the deliberations of a given jury"); *Rose v. State*, 752 S.W.2d 529, 537 (Tex. Crim. App. 1987), *abrogated by Karenev v. State*, 281 S.W.3d 428 (Tex. Crim. App. 2009) (asserting that fundamental error existed because an erroneous parole law instruction "is virtually immune from challenge," that its effect on [a] jury "can never properly be discovered and adequately determined," and that "[t]he risk that punishment will be based on extraneous considerations is intolerable in a society that constitutionally demands concepts of fundamental fairness be honored in its criminal justice system"); *Karenev*, 281 S.W.3d at 439–40 (Cochran, J., concurring) (reasoning that error in convicting appellant under a penal statute that had previously been declared unconstitutional by the Court of Criminal Appeals was fundamental because the "main reasons for requiring a contemporaneous objection in the trial court" do not apply); *G.A.O. v. State*, 854 S.W.2d 710, 715 (Tex. App.—San Antonio 1993, no pet.) (asserting that "[f]undamental error is error that directly and adversely affects the interests of the public generally, as such interest is declared in statutes or the constitutions of the State").

*Morrison v. State*, 575 S.W.3d 1, 23–25 (Tex. App.—Texarkana 2019, no pet.).   Under the circumstances of this case, we cannot conclude that the lack of a written pleading expressing the TJJD's request to the trial court for a transfer or release hearing was error, much less fundamental error.[18]

We, therefore, overrule D.O.R.'s second point of error.

## III.   Conclusion

For these reasons, we affirm the trial court's transfer order.

Scott E. Stevens
Justice

Date Submitted:     November 9, 2020
Date Decided:       January 13, 2021

---

[18]D.O.R. fails to provide the Court with caselaw to support his contention that a written pleading was required, and we have found none.