Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



## OPINION

Nos. 04-12-00204-CV & 04-12-00205-CV

**IN THE MATTER OF N.K.M**

From the 289th Judicial District Court, Bexar County, Texas
Trial Court Nos. 2009-JUV-01790 & 2009-JUV-01693
The Honorable Lisa Jarrett, Judge Presiding

Opinion by:     Catherine Stone, Chief Justice

Sitting:       Catherine Stone, Chief Justice
               Phylis J. Speedlin, Justice
               Rebecca Simmons, Justice

Delivered and Filed:  November 7, 2012

AFFIRMED

N.K.M. appeals the trial court's order transferring him from the Texas Juvenile Justice Department to the Texas Department of Criminal Justice. N.K.M. asserts he was denied his due process right to a fair hearing because he must admit guilt, in contravention of his right against self-incrimination, in order to participate in the Capital and Serious Violent Offender Treatment Program. N.K.M. also contends the trial court abused its discretion in ordering his transfer to the Texas Department of Criminal Justice to serve the remainder of his sentence. We affirm the trial court's order.

## BACKGROUND

In 2009, N.K.M. was convicted by a jury of aggravated assault in one incident, and aggravated robbery and aggravated kidnapping in another. The trial court assessed a twenty-year determinate sentence, meaning he entered the Texas Juvenile Justice Department (TJJD) with the possibility of later being transferred to the Texas Department of Criminal Justice (TDCJ) to finish serving his sentence. In March 2012, with N.K.M.'s nineteenth birthday approaching, and upon request by the TJJD, the trial court held a transfer hearing to determine whether N.K.M. should be released on parole or transferred to the TDCJ for the remainder of his sentence. One witness was called by the State to testify at the hearing, and four witnesses were called by N.K.M. to testify.

The State called Leonard Cucolo, the court liaison for the TJJD, who conveyed the TJJD's recommendation that N.K.M. be transferred to the TDCJ to complete his sentence. Cucolo testified N.K.M. had some successes while at the TJJD, including completion of an alcohol and drug program as well as Aggression Replacement Training (ART). He also stated N.K.M. exhibited good behavior in the eight months prior to the hearing. However, when asked about his behavior over the duration of his time at TJJD, Cucolo explained that N.K.M. had 35 documented incidents, including bad behavior and possession of contraband, money, and prohibited pills.

Despite these incidents of bad conduct, Cucolo maintained the reason the TJJD was recommending N.K.M. be transferred to the TDCJ was because he had not completed the Capital and Serious Violent Offender Treatment Program (Offender Program). The TJJD's concern about not completing the Offender Program, as attested by Cucolo, was that N.K.M.'s primary treatment need and its associated risk factors had not been sufficiently addressed. Although

N.K.M. did attend orientation for the Offender Program, Cucolo stated N.K.M. was unable to enter the Offender Program because he maintains his innocence and because of "his denial of his offense throughout his stay." Completion of the Offender Program is a requirement for the TJJD to recommend that N.K.M. be released on parole.

On cross-examination, Cucolo testified that thirty-five incidents is not a significant number of incidents; however, it is the nature of the incidents that may be important. Additionally, Cucolo acknowledged the existence of a waiver process for the Offender Program, but stated that N.K.M. was not eligible for a waiver because of his classification.[1] Cucolo also submitted to the court a report containing the information about which he testified as well as other more detailed information.

N.K.M. first called Stephen Kennedy, a case manager for the alcohol and drug program that N.K.M. completed. Kennedy stated N.K.M. attended every session and was on time, respectful, and focused on changing his life and doing better. He also testified N.K.M. had grown emotionally and had matured a lot. Moreover, Kennedy asserted his belief N.K.M. internalized the lessons and could likely use them in his future setting. On cross-examination, Kennedy stated N.K.M. had a moderate alcohol and drug problem when he entered TJJD, but he recognized this was not N.K.M.'s primary treatment need, to which he could not speak.

N.K.M. next called Bernie Scott, Jr., N.K.M's caseworker at the TJJD for approximately the past nine months. Scott reiterated that N.K.M completed ART. He also agreed that some offenders can seek a waiver to substitute ART for the Offender Program, but he was not aware whether N.K.M. had applied for a waiver. When asked about disturbances between the offenders, Scott stated he did not know whether N.K.M. was involved in past disturbances

---

[1] Cucolo stated that the waiver allows some offenders with a lower treatment classification to substitute other courses, including ART, for the Offender Program in order to obtain a release recommendation.

(before he was N.K.M.'s caseworker), but he knew N.K.M. was not involved in the most recent disturbance involving seventy to eighty of the almost three hundred juveniles at the facility. Furthermore, Scott reported that N.K.M. participated and did very well in programs designed to teach offenders to respect each other's differences. Scott also testified that N.K.M. wanted to get his education and acquire vocational skills. Additionally, Scott stated that daily reports from N.K.M's instructors were usually positive with good remarks. Finally, Scott described N.K.M. as respectful and polite, and said he felt N.K.M. could continue to grow and develop if paroled.

On cross-examination, Scott acknowledged N.K.M.'s involvement in an earlier disturbance where some offenders vandalized the dorm and N.K.M., specifically, yelled profanities at the staff and resisted security. On redirect examination, Scott established that the disturbance mentioned on cross-examination was only two months after N.K.M.'s arrival and that no one was injured, and he reiterated that N.K.M. did not participate in the recent "big" incident involving fights between gang members. Scott also echoed that the sole reason for N.K.M's exclusion from the Offender Program was because he would not admit guilt.

The third witness N.K.M. called was Dr. Steven Brownlow, a psychologist with the TJJD, who appeared in place of N.K.M.'s psychologist, Dr. Varnado.[2] Dr. Brownlow explained that he interacts mostly with people who are causing trouble or having psychological distress, and that because N.K.M. was not one of those persons, he did not personally know N.K.M. Dr. Varnado prepared a forensic evaluation, attested to by Dr. Brownlow, containing recommendations for N.K.M. if he was placed on parole by the trial court. These recommendations included super intensive supervision, counseling, forty hours of work or school per week, a referral to the department of mental health for his psychiatric problems, and reassessment every twelve months.

---

[2] N.K.M.'s psychologist was pursuing retirement for medical disability under the Family Medical Leave Act.

On cross-examination, Dr. Brownlow agreed that N.K.M. had not completed the Offender Program and that for the TJJD to address his risk factors and make a recommendation for parole, the offender must admit what they have done so the doctors can identify and understand the offender's risk factors. Dr. Brownlow also admitted knowing of N.K.M.'s prior adjudications for possession of a dangerous drug, fighting, and possession of tobacco, as well as a prior arrest for delivery of a dangerous drug. There was also evidence N.K.M. had shoplifted, vandalized an abandoned house, and sold other illegal drugs. Moreover, after acknowledging N.K.M. had admitted gang affiliation then subsequently denied it, Dr. Brownlow stated his suspicions would be raised by N.K.M.'s contradicting statements. Dr. Brownlow also testified Dr. Varnado's findings were that N.K.M. had extreme defensiveness, extreme use of denial, and poor insight, and that N.K.M. was a moderate risk to the community.

On redirect, Dr. Brownlow admitted N.K.M.'s priors were about five years before the hearing, N.K.M. was young and immature at that time, juveniles change behaviors quickly, and N.K.M has learned and grown since participating in programs at the TJJD. Dr. Brownlow also conceded to the "proverbial catch-22" in which N.K.M. was placed by having to admit guilt in order to enter the Offender Program, and possibly attain a parole recommendation, while also pursuing an appeal of his conviction. Moreover, recognizing N.K.M.'s participation in ART, Dr. Brownlow explained the program's high level of empirical support nationally. On re-cross examination, Dr. Brownlow expressed concern that N.K.M. was denying his role in the offenses even after his conviction was affirmed on appeal.

Finally, N.K.M called his father to testify. Remarking on N.K.M.'s growth over the past three years, his father stated N.K.M. had matured a lot and started to think. When asked about N.K.M.'s involvement in different programs at the TJJD, his father testified they tried to get

N.K.M. a waiver for the Offender Program and were under the impression that his involvement in ART could act as a substitute. His father also explained that he and his wife, N.K.M.'s mother, have maintained consistent contact with N.K.M. and have established school and work plans for N.K.M. if he was released on parole, incorporating the welding and customer service skills he attained at the TJJD. He also assured the court they would abide by Dr. Varnado's recommendations.

On cross-examination, N.K.M.'s father reiterated the family's confusion about the waiver, and he stated he did not encourage N.K.M. to participate in the Offender Program against N.K.M.'s will because he felt N.K.M. would have to sacrifice his integrity by lying about his guilt. When asked about a community's concern over releasing someone who was convicted of such serious crimes but denies guilt, N.K.M.'s father stated he could understand some concern but that a conviction could be prejudicial if the person is innocent.

After both sides rested, the parties began closing arguments. During N.K.M.'s closing argument, the presiding judge recognized a member of N.K.M.'s family as being related to her family by marriage. She immediately recused herself. Judge Lisa Jarrett was thereafter appointed to conclude the hearing and make a determination. Judge Jarrett reviewed the transcripts and materials from the prior hearing, and held a new hearing allowing the parties to recall witnesses and finish arguments. At the conclusion of the hearing, Judge Jarrett ordered N.K.M. to be transferred to the TDCJ to serve the remainder of his sentence.

### DUE PROCESS AND THE RIGHT AGAINST SELF-INCRIMINATION

In his first point of error, N.K.M. asserts his due process right to a fair hearing was violated because he would be required to incriminate himself in order for the TJJD to recommend he be released on parole. The State argues N.K.M. waived this point of error

because it was not clearly presented to the trial court. Regardless of whether N.K.M.'s claim was properly preserved, N.K.M. loses on the merits of his claim because his release was not conditioned upon completion of the Offender Program; rather, the TJJD's parole *recommendation* was conditioned upon his completion of the Offender Program. *See Chapman v. State*, 115 S.W.3d 1, 8 (Tex. Crim. App. 2003) (holding that the appellant was not compelled to incriminate himself when he was not placed in the classic penalty situation). The TJJD's recommendation was only one factor the trial court considered in determining whether N.K.M. should be released or transferred. Even if N.K.M. had completed the Offender Program, there was no guarantee the trial court would have placed him on parole instead of transferring him to the TDCJ.

In fact, the trial court stated it considered a number of things other than the TJJD's recommendation. There was evidence that N.K.M.'s psychologist determined that he needed more time in treatment and that he exhibited an unwillingness to admit to psychological problems and an extreme use of denial. Moreover, the crimes for which N.K.M. was sent to TJJD were very violent in nature and he continued to exhibit behavioral problems while at the TJJD, which is exhibited by the thirty-five disciplinary citations he received. In light of all of the evidence considered by the trial court, we cannot say N.K.M. was denied probation solely because of his refusal to admit guilt.

## TRANSFER FROM TJJD TO TDCJ

### A. Standard of Review

We review a trial court's decision to transfer a juvenile from TJJD to TDCJ for an abuse of discretion. *In re D.L.*, 198 S.W.3d 228, 229 (Tex. App.—San Antonio 2006, pet. denied); *In re J.D.P.*, 149 S.W.3d 790, 792 (Tex. App.—Fort Worth 2004, no pet.). In determining whether

the trial court abused its discretion, we must review the entire record to determine if the trial court acted arbitrarily, unreasonably, or without reference to any guiding principles or rules. *In re D.L.*, 198 S.W.3d at 229; *In re J.L.C.*, 160 S.W.3d 312, 313 (Tex. App.—Dallas 2005, no pet.). The trial court's decision will be upheld if the record contains some evidence to support it. *In re D.L.*, 198 S.W.3d at 229; *In re J.L.C.*, 160 S.W.3d at 313.

### B. Texas Family Code

After a juvenile with a determinate sentence reaches the age of sixteen, but before reaching the age of nineteen, the TJJD may request an order approving the transfer of the juvenile to the TDCJ if the sentence has not been completed and the juvenile poses a continuing risk to the community's welfare. Act of May 19, 2011, 82nd Leg., R.S., ch. 85, sec. 1.007, § 244.014, 2011 Tex. Sess. Law Serv. 438 (West) (codified as amended at TEX. HUM. RES. CODE ANN. § 244.014 (West Supp. 2012)) (redesignating and amending former TEX. HUM. RES. CODE ANN. § 61.0791).[3] The juvenile court must conduct a hearing to make this determination. TEX. FAM. CODE ANN. § 54.11(a), *amended by* Act of May 19, 2011, sec. 3.007, § 54.11(a). After evidence has been presented and the hearing has concluded, the trial judge may order the juvenile to be transferred to the TDCJ for completion of his sentence or to be returned to the TJJD with or without approval for release. *Id.* § 54.11(i), (j), *amended by* Act of May 19, 2011, sec. 3007, § 54.11(i), (j).

When conducting a transfer hearing, a trial court may consider written reports provided by "probation officers, professional court employees, professional consultants, or employees of

---

[3] The Act of May 19, 2011, 82nd Leg., R.S., ch. 85, 2011 Tex. Sess. Law Serv. 438 (West) abolished the Texas Youth Commission and the Texas Juvenile Probation Commission, and it replaced those commissions with the Texas Juvenile Justice Department. The Act also amended some, but not all, code sections referring to either of those commissions.

the [Texas Juvenile Justice Department],” as well as the testimony of witnesses. *Id.* § 54.11(d). In making a decision whether to transfer a juvenile, the court may consider:

> [1] the experiences and character of the person before and after commitment to the youth commission, [2] the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed, [3] the abilities of the person to contribute to society, [4] the protection of the victim of the offense or any member of the victim’s family, [5] the recommendations of the [TJJD] and prosecuting attorney, [6] the best interests of the person, and [7] any other factor relevant to the issue to be decided.

*Id.* § 54.11(k). The court is not obliged to consider all of the factors listed, and it may consider relevant factors not listed. *In re J.J.*, 276 S.W.3d 171, 178 (Tex. App.—Austin 2008, pet. denied). Additionally, the court can assign differing weights to the factors considered. *Id.*

### C. Analysis

In this case, the trial court heard five witnesses and was given multiple reports and exhibits for consideration. Both favorable and unfavorable evidence about N.K.M.’s behavior was presented. In its Order of Transfer, the trial court stated it took into consideration the seven factors listed in the statute when making its determination. The court also found that N.K.M. was of “sufficient intellectual abilities and sophistication to be committed at the Institutional Division of the Texas Department of Criminal Justice.” In making its determination, the trial court reviewed the witnesses’ testimony, reports provided by witnesses and the TJJD, N.K.M.’s case file, and the parties’ arguments.

Although N.K.M. presented some favorable evidence regarding his behavior while committed to the TJJD, the State rebutted with evidence showing many instances of misconduct during that same time. Additionally, the State presented evidence that N.K.M. had several prior adjudications of juvenile delinquency. Moreover, the trial court was permitted to consider the TJJD’s recommendation that N.K.M. not be paroled and the serious nature of the offenses of

which N.K.M. was convicted. TEX. FAM. CODE ANN. § 54.11(k). The trial court could also assess varying amounts of weight to the evidence, as well as believe or disbelieve the witnesses' testimony. *In re J.J.*, 276 S.W.3d at 178; *see State v. Ross*, 32 S.W.3d 853, 854 (Tex. Crim. App. 2000) (en banc) (explaining that the fact finder is the sole judge of credibility of witnesses). Therefore, based on the evidence presented, the trial court did not abuse its discretion in ordering that N.K.M. be transferred to TDCJ because there is some evidence in the record to support its determination.

### CONCLUSION

The trial court's order is affirmed. Because the trial court reviewed all of the materials available and considered every factor listed in Section 54.11(k) of the Texas Family Code, we conclude the trial court did not abuse its discretion in ordering that N.K.M. be transferred to the TDCJ.

Catherine Stone, Chief Justice