

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00010-CV

IN THE MATTER OF Q.P.O.

On Appeal from the County Court at Law
Bowie County, Texas
Trial Court No. 17JV0007-CCL

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

## MEMORANDUM OPINION

In 2017, Q.P.O. pled guilty to and was adjudicated by the trial court for delinquent conduct after he perpetrated two aggravated robberies when he was sixteen years old. The trial court committed Q.P.O. to the Texas Juvenile Justice Department (TJJD) for a determinate sentence of thirty-five years. In 2019, although Q.P.O. had made admirable efforts to do the right things during most of his time with TJJD, the trial court transferred Q.P.O.'s case to the Texas Department of Criminal Justice Correctional Institutions Division (TDCJ-CID) so he could serve the remainder of his sentence. In his sole point of error on appeal, Q.P.O. argues that the trial court abused its discretion in transferring him to TDCJ-CID. Because we find evidence supporting the trial court's ruling, we affirm the trial court's transfer order.

*(1)     Standard of Review*

"Where a juvenile has been adjudicated and committed to TJJD and subsequently is transferred to TDCJ-CID, we review the trial court's order for an abuse of discretion." *In re M.C.*, 502 S.W.3d 852, 854 (Tex. App.—Texarkana 2016, pet. denied) (citing *In re T.D.H.*, 971 S.W.2d 606, 610 (Tex. App.—Dallas 1998, no pet.)). "In determining whether the trial court abused its discretion, we review the entire record to determine if the trial court acted arbitrarily, unreasonably, or without reference to any guiding principles or rules." *Id.* (quoting *In re A.C.*, No. 10-14-00364-CV, 2015 WL 6437696, at *1 (Tex. App.—Waco Oct. 22, 2015, no pet.) (mem. op.)). "The trial court's decision will be upheld if the record contains some evidence to support it." *Id.* (citing *In re N.K.M.*, 387 S.W.3d 859, 864 (Tex. App.—San Antonio 2012, no pet.)).

2

Under the Texas Human Resources Code, a juvenile serving a determinate sentence for a first-degree felony "must serve at least three years of the meted sentence in TJJD" unless the juvenile court approves a release at the transfer hearing. *Id.* at 855 (citing TEX. HUM. RES. CODE ANN. § 245.051(c)(2)). At the time of the transfer hearing, held on the day before his nineteenth birthday, Q.P.O. was five months short of the three years. "Once a juvenile attains the age of nineteen, the TJJD loses control over that juvenile." *Id.* (citing TEX. HUM. RES. CODE ANN. § 245.151(e)). "Because of the determinate sentence, the trial court could either release Q.P.O. to parole under TDCJ-CID's supervision or transfer him to TDCJ-CID for continued confinement." *Id.* "[A] transfer/release hearing conducted under Section 54.11 is a 'second chance hearing' that gives juveniles—who have previously been sentenced to a determinate number of years—a second chance to persuade the court that they should not be imprisoned." *In re A.V.*, No. 11-18-00135-CV, 2020 WL 2836432, at *2 (Tex. App.—Eastland May 29, 2020, no pet.) (mem. op.) (quoting *In re D.L.*, 198 S.W.3d 228, 230 (Tex. App.—San Antonio 2006, pet. denied)).

In deciding whether to transfer a juvenile to TDCJ-CID,

> the court may consider the experiences and character of the person before and after commitment to the Texas Juvenile Justice Department or post-adjudication secure correctional facility, the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed, the abilities of the person to contribute to society, the protection of the victim of the offense or any member of the victim's family, the recommendations of the Texas Juvenile Justice Department, county juvenile board, local juvenile probation department, and prosecuting attorney, the best interests of the person, and any other factor relevant to the issue to be decided.

*M.C.*, 502 S.W.3d at 856–57 (quoting TEX. FAM. CODE ANN. § 54.11(k) (Supp.)). "Within its discretion, the trial court may assign different weights to the factors it considers, and the court

3

need not consider every factor." *In re H.C.*, No. 02-15-00149-CV, 2016 WL 354297, at *2 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.).

(2)     *Evidence at the Transfer Hearing*

a.     Evidence against Q.P.O.

At the second-chance hearing, there was evidence supporting the trial court's decision. John Bunch testified that Q.P.O. robbed him at gunpoint while he was parked in his car outside of his home. Bunch, who was forty-seven-years-old, said that he had been "a nervous wreck . . . since [Q.P.O.] had a revolver a few inches from [his] face, [while] screaming at [him]." Bunch explained the fear he had for his life and the impact of Q.P.O.'s actions on him. Bunch asked that, since Q.P.O. knew where Bunch lived, he should remain in custody. The victim of Q.P.O.'s other aggravated robbery did not testify because, according to the State, she did not wish to relive the experience.

The State admitted into evidence a psychological evaluation that was conducted by Toney Charles in 2017. According to Charles, Q.P.O. was first arrested in 2014 for stealing a hat from Target; had arrests for furnishing a weapon to a minor, loitering, and breaking and entering; had been caught with marihuana at school; and was previously released from a six-month substance abuse treatment program in 2016. In addition to the aggravated robberies, Q.P.O. had "[ac]companying charges [for] . . . possession of marijuana, less than 2 ounces," and admitted that he used marihuana "every day, like all the time," smoked tobacco, drank alcohol, took ecstasy, and abused prescription medications. When asked about his drug use, Q.P.O. said, "I ain't never said I'm gonna stop smoking weed," and admitted he used marihuana on the

4

afternoon of his release from the 2016 substance abuse treatment program. At the time of the evaluation, he was homeless and not enrolled in school. Charles concluded that Q.P.O. appeared to have "impulsive propensity[] and delinquent predisposition."

Alana Bennett, the TJJD court liaison, testified that Q.P.O. had thirty-nine write-ups while confined in TJJD. Of the thirty-nine incidents on Q.P.O.'s TJJD record, twenty-nine resulted in referrals to the Regulation and Safety Unit," and he had "three major rule violations," including "masturbation in open/obvious way and exposure" and "assault-unauthorized physical contact with staff." While there were no active criminal investigations against him, Q.P.O. was suspected by the Office of Inspector General as being a member of the "Money Organization Business," and Q.P.O. admitted to gang involvement during his intake interview into TJJD. Leggett testified, and the evidence showed, that Q.P.O. functioned well in a structured setting.

b.    Evidence favoring Q.P.O.

On the other hand, strong evidence was presented in favor of Q.P.O. Before this confinement, Q.P.O. had no prior history with TJJD. Bennett explained the thirty-nine write-ups of Q.P.O. during his early months of confinement at TJJD, saying that it was not unusual to see many write-ups during the first six months because it was an "adjustment period." Bennett testified that most of Q.P.O.'s write-ups occurred during his adjustment period, that Q.P.O. occasionally self-reported incidents requiring write-ups, and that the number of reports were "on the low end of referrals." She also explained that TJJD had five stages of improvement and that Q.P.O. had ascended to the highest level, which showed that he was applying skills he learned in TJJD programs and was preparing for reentry into the community. As a result of his behavior,

5

Q.P.O. had earned the privilege of playing football outside of TJJD and completed fifteen hours of college credit. Bennett recommended Q.P.O. for parole, as did Q.P.O.'s dorm supervisor, individual case manager, psychologist, and TJJD's executive director.

Diana Leggett, a volunteer with the Gainesville State School and the coordinator for a reentry support project, testified that Q.P.O. had "matured greatly over time," obtained his GED in the first month of confinement, started college, was accepted into a local community college to continue his education if paroled, obtained a number of certifications to enable him to get a job, completed a substance abuse treatment program, and was "a very positive influence on a number of youth in terms of helping them redirect their behavior." Leggett also recommended Q.P.O. for parole.

Judy Davis, Q.P.O.'s mentor at Gainesville State School, testified that, in addition to his college courses, Q.P.O. did the following:

> He completed his GED, Adobe Illustrator, Microsoft PowerPoint, telecommunications, NCCER certification, which is welding, C-Tech certification, OSHA training for ten hours, and forklift operator training. He worked on campus, making minimum wage. He saved over $300 to use upon re-entry for his start-up necessities. He worked in the cafeteria, preparing, serving, and cleaning up. He did the janitorial services for the admin, the school building, cafeteria, and gym. He was in some mentor or volunteer classes or things on campus. One was Kings of Christian Fellowship. Another was a Men of Distinction group. And in that, they did volunteer work at Vista and the food pantry for the city of Gainesville. He volunteered at a nursing home there in Gainesville, where they made decorations for holiday trays for the nursing home facility, and then he did outside yard work and cleanup for the same nursing home facility. He played on the six-man football team and got honorable mention for playing. He was on the team that made the -- the first time the state school ever went to state, and they won their division championship. He played on the basketball team and also received honorable mention. He had positive relationships with the TJJD dorm staff, the state administrative employees, the school employees, and the teachers. He completed the violent offender program.

He was a participant and an alumni. He completed the moderate alcohol and other drug treatment program. He was the state spelling bee champion for the state school, and he placed fourth overall within the state.

Davis also provided numerous examples of Q.P.O.'s positive behavior and impact on others.[1] She concluded by testifying that there was no doubt in her mind that Q.P.O. should be paroled.

T.G., Q.P.O.'s grandmother, testified that Q.P.O. would live with his aunt and uncle in Garland, Texas, and their home had already been vetted by the "[p]arole office." T.G. testified that it was best for Q.P.O. to move away from the people who were bad influences in the juvenile's life.

At the end of this hearing, the State did not contest the fact that Q.P.O. had "done well" after his initial six months with TJJD, but still recommended that Q.P.O. be transferred to TDCJ-CID. The trial court agreed.[2]

---

[1]Davis testified,

> He was always considerate and respectful to the women in the room and would apologize for any foul language or other bad behavior by youth when they were in the room, and that was at VC or on the dorm. He would always share his snacks with me and the other youth that were at our table and may not have a mentor. He was able to purchase snacks for them. He taught other youth, many of them, how to play chess, and he was an excellent chess player and teacher.

[2] The trial court made the following comment before ordering Q.P.O.'s transfer:

> I do want to commend you for what you've accomplished while in T[JJD]. I do think that that shows that you're on a path to rehabilitation. However, I believe the best indicator of future conduct is a person's past conduct. And we're here -- you pled to one aggravated robbery at gunpoint, and then there was another one. And I take [the State]'s arguments to heart that it does appear that you can function very well and excel in a structured environment. But I've taken an oath to protect not only the citizens of Bowie County, but also the State of Texas, and the risk assessment does indicate that you are at high risk to go back into a gang activity and to go back and commit violent offenses.

7

*(3)    Analysis*

Our disposition here is controlled by the standard of review.  We cannot "reverse the trial court's ruling simply because we disagree with its decision."  *In re C.H.R.*, No. 04-14-00336-CV, 2015 WL 1089661, at *1 (Tex. App.—San Antonio Mar. 11, 2015, no pet.) (mem. op.).  This is because "[w]e do not substitute our decision for that of the juvenile court and we reverse its order only if the juvenile court acted in an unreasonable or arbitrary manner."  *In re C.Z.*, No. 03-17-00665-CV, 2018 WL 2224932, at *2 (Tex. App.—Austin May 16, 2018, no pet.) (mem. op.) (quoting *In re D.J.*, No. 07-16-00013-CV, 2018 WL 828344, at *2 (Tex. App.—Amarillo Feb. 12, 2018, no pet.) (mem. op.)).

The recommendations of TJJD and testimony at the transfer hearing showed that Q.P.O. was much improved and capable of contributing to society and would have supported a finding placing Q.P.O. on parole had the trial court exercised its discretion in making that choice.  However, the trial court was free to weigh more heavily Q.P.O.'s negative actions, experiences, and characteristics in concluding that it was in Q.P.O.'s best interests to remain in a structured environment.  The trial court focused on Q.P.O.'s commission of first-degree-felony-robbery offenses and his use of a firearm to threaten victims during the commission of those offenses.  Because Bunch testified that Q.P.O. knew where he lived and that he would not feel safe if Q.P.O. were released, the trial court could have found that paroling Q.P.O. would not adequately protect his victims.  The court also could have considered the State's recommendation, Q.P.O.'s past gang affiliation and drug abuse, the fact that Q.P.O. had previously returned to drug abuse

8

on the day of his release from a substance abuse treatment program, and that Q.P.O. had served only thirty-one months.

We have previously written that there is evidence in the record to support a transfer to TDCJ-CID when the hearing shows "(a) [the juvenile] continued to have behavioral problems while in TJJD's custody; (b) the prosecuting attorney recommended transfer to TDCJ–[C]ID; and (c) the underlying offense was violent." *In re D.V.W.*, No. 06-14-00054-CV, 2015 WL 167682, at *2 (Tex. App.—Texarkana Jan. 14, 2015, no pet.) (mem. op.). Here, all three were shown, the behavioral problems, admittedly, in the earlier part of his custody.

Here, it appears to us that Q.P.O. "got with the program" after his first few months in TJJD, made serious efforts to turn his life around, and served as a role model for other juveniles. Nevertheless, because there was evidence supporting the trial court's decision, we cannot conclude that the trial court acted arbitrarily, unreasonably, or without reference to any guiding rules and principles when it ordered that Q.P.O. be transferred to TDCJ-CID. As a result, we find that the trial court did not abuse its discretion and overrule Q.P.O.'s sole point of error.

We affirm the trial court's transfer order.


Josh R. Morriss, III
Chief Justice

Date Submitted:      August 6, 2020
Date Decided:        September 18, 2020

9