

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00003-CV
_____

IN THE MATTER OF K.T., A JUVENILE

On Appeal from the County Court at Law
Harrison County, Texas
Trial Court No. 5064

Before Morriss, C.J., Stevens and Carter,* JJ.
Memorandum Opinion by Justice Carter

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

MEMORANDUM OPINION

On October 18, 2019, K.T.[1] pled true to and was adjudicated by the trial court for delinquent conduct after he committed two counts of aggravated robbery. The trial court committed K.T. to the Texas Juvenile Justice Department (TJJD) for a determinate sentence of fifteen years. On November 18, 2021, which was less than one month from K.T.'s nineteenth birthday, the trial court transferred K.T. to the Texas Department of Criminal Justice (TDCJ) so that he could serve the rest of his sentence.

On appeal, K.T. argues that the trial court abused its discretion when it transferred him to the TDCJ. In light of the evidence presented at the transfer hearing, we find that the trial court did not abuse its discretion by transferring K.T. to the TDCJ. As a result, we affirm the trial court's transfer order.

## I. The Trial Court Did Not Abuse Its Discretion in Transferring K.T. to the TDCJ

### A. Standard of Review

"Where a juvenile has been adjudicated and committed to TJJD and subsequently is transferred to TDCJ[], we review the trial court's order for an abuse of discretion." *In re D.O.R.*, No. 06-20-00036-CV, 2021 WL 115772, at *1 (Tex. App.—Texarkana Jan. 13, 2021, no pet.) (mem. op.) (alteration in original) (quoting *In re M.C.*, 502 S.W.3d 852, 854 (Tex. App.—Texarkana 2016, pet. denied) (citing *In re T.D.H.*, 971 S.W.2d 606, 610 (Tex. App.—Dallas 1998, no pet.))). "In determining whether the trial court abused its discretion, we review the entire record to determine if the trial court acted arbitrarily, unreasonably, or without reference to

---

[1]We use initials to protect the juvenile's identity. *See* TEX. R. APP. P. 9.8.

2

any guiding principles or rules." *Id.* (quoting *In re A.C.*, No. 10-14-00364-CV, 2015 WL 6437696, at *1 (Tex. App.—Waco Oct. 22, 2015, no pet.) (mem. op.) (citing *In re D.L.*, 198 S.W.3d 228, 229 (Tex. App.—San Antonio 2006, pet. denied))). "The trial court's decision will be upheld if the record contains some evidence to support it." *Id.* (quoting *In re A.C.*, 2015 WL 6437696, at *1) (citing *In re N.K.M.*, 387 S.W.3d 859, 864 (Tex. App.—San Antonio 2012, no pet.))).

Aggravated robbery is a first-degree felony offense. *See* TEX. PENAL CODE ANN. § 29.03(b). Under the Texas Human Resources Code, "the department may not release the child under supervision without approval of the juvenile court that entered the order of commitment unless the child has served at least" three years of his sentence in the TJJD. TEX. HUM. RES. CODE ANN. § 245.051(c)(2). Because K.T. was adjudicated for delinquent conduct that constituted a first-degree felony and had not yet served three years of his sentence, TJJD could not release him under supervision without approval of the juvenile court. K.T.'s nineteenth birthday was on December 4, 2021. "Once a juvenile attains the age of nineteen, the TJJD loses control over that juvenile." *In re D.O.R.*, 2021 WL 115772, at *1 (quoting *In re M.C.*, 502 S.W.3d at 855) (citing TEX. HUM. RES. CODE ANN. § 245.151(e))). As of the date of the transfer order, K.T. had not completed the three-year minimum period of confinement.

"Because of [K.T.'s] determinate sentence, the trial court could either release [him] to parole under TDCJ[]'s supervision or transfer him to TDCJ[] for continued confinement." *Id.* (second through fourth alterations in original) (quoting *In re M.C.*, 502 S.W.3d at 855). "[A] transfer/release hearing conducted under Section 54.11 is a 'second chance hearing' that gives

3

juveniles—who have previously been sentenced to a determinate number of years—a second chance to persuade the court that they should not be imprisoned." *Id.* (alteration in original) (quoting *In re A.V.*, No. 11-18-00135-CV, 2020 WL 2836432, at *2 (Tex. App.—Eastland May 29, 2020, no pet.) (mem. op.) (quoting *In re D.L.*, 198 S.W.3d 228, 230 (Tex. App.—San Antonio 2006, pet. denied))).

> Texas Family Code Section 54.11(k) states that, in making its transfer decision,
>
> the court may consider the experiences and character of the person before and after commitment to the Texas Juvenile Justice Department or post-adjudication secure correctional facility, the nature of the penal offense that the person was found to have committed and the manner in which the offense was committed, the abilities of the person to contribute to society, the protection of the victim of the offense or any member of the victim's family, the recommendations of the Texas Juvenile Justice Department, county juvenile board, local juvenile probation department, and prosecuting attorney, the best interests of the person, and any other factor relevant to the issue to be decided.

*Id.* (quoting *In re M.C.*, 502 S.W.3d at 856–57 (quoting TEX. FAM. CODE ANN. § 54.11(k))). "Within its discretion, the trial court may assign different weights to the factors it considers, and the court need not consider every factor." *Id.* (quoting *In re H.C.*, No. 02-15-00149-CV, 2016 WL 354297, at *2 (Tex. App.—Fort Worth Jan. 28, 2016, no pet.) (mem. op.)).

### B.     Evidence Presented

There were two transfer hearings in this case. At the first hearing conducted on August 26, 2020, Alanna Bennett, court liaison for the TJJD, testified that K.T.'s progress during his time with the TJJD was "very limited" as a result of his "very violent . . . gang related behavior" and that K.T. had collected nine major rule violations, including for assaultive behavior and destruction of property. In describing one of the rule violations, Bennett testified

4

that K.T. jumped into a fight, "started beating and punching, pounding on his peer and kicking and stomping on his head," refused to obey commands from staff to stand down, and continued the assault despite being pepper sprayed twice.

As a result of his behavior, K.T. was placed in "the most restrictive," "security-based program" at the TJJD, called the Phoenix Program. Bennett said that K.T. was not always respectful to the TJJD staff, did not take responsibility for his behavior, and had twenty-three incidents that were classified as being "disruptive or even dangerous to other youth" or himself. Bennett added that K.T. had not progressed academically, did not participate in any vocational classes because of his behavior, and did not complete violent offender treatment, drug and alcohol treatment, and other treatments necessary to address his behavioral issues.

Bennett said that K.T. completed psychological evaluations performed by Carrie Tipton and Dr. Evan Norton "to assess psychological functioning as well as his assessment of programming while in TJJD." According to Bennett, both Tipton and Norton concluded that there was no mental condition to blame for K.T.'s conduct, that the TJJD could not assist him, and that he should be transferred to the TDCJ. Bennett said that K.T. had completed the Phoenix Program approximately ten days before the hearing and had no incidents of violent behavior since his release from the program. Even so, Bennett testified that the programs available to assist K.T. did not help him because he "just refused to do what he needed to do." She believed K.T. was a danger to the staff and his peers. As a result, Bennett also recommended K.T.'s transfer to the TDCJ.

5

K.T. testified that he worked on controlling his anger in the Phoenix Program and believed he was equipped with the tools to do so. While at the Phoenix Program, K.T. testified, he only had one incident, completed his course of study, and attended counseling sessions. K.T., who admitted to being a member of the Bloods gang, testified that the Phoenix Program changed his outlook on life, and he prayed for another opportunity to progress through the TJJD's five-stage program even though he was still on the first stage at the time of the hearing.

At the end of the first hearing, the trial court denied the transfer motion to give K.T. another opportunity to improve his behavior. However, the trial court warned K.T. that further incidents would likely result in another motion to transfer.

On November 18, 2021, the trial court heard a second motion to transfer. After taking judicial notice of its file and the testimony from the prior hearing, the trial court heard from Bennett for a second time. Bennett testified that, although K.T. had progressed through four of the five stages of the program, his behavioral issues, including continued aggression, intimidation, and manipulation, had increased since the time of the first hearing. Bennett clarified that K.T. had acquired 126 new incidents and seventy rule violations after the first hearing and was "involved with a group of other youths at the facility that [were] bullying, extorting, [and] intimidating [juveniles] as well as staff." According to Bennett, K.T. committed assault, encouraged another peer to hit a youth who was on suicide alert, and was aggressive toward female staff members. After he was again placed in a violent-offender treatment program, his behavior made it difficult for other youth to participate in the program. As a result,

K.T. was taken out of the program, which he never successfully completed, and was placed in a behavior modification program.[2]

In preparation for the second hearing, K.T. underwent another psychological evaluation by Daniel Croft, who also concluded that he had not benefited from the TJJD programming and should be transferred to the TDCJ. According to Bennett, Croft noted that K.T. continued to exhibit risky behavior and was labeled as a likely reoffender. Bennett testified that the TJJD recommended transfer to the TDCJ because it could not rehabilitate him.

In his defense, K.T. testified that he was at the "[w]rong place at the wrong time" during the additional incidents and believed he would have completed all five of the TJJD stages if there were no staff shortages during the pandemic. He claimed that he engaged in horseplay but had not fought anyone, that the incidents Bennett mentioned were not proven true, and that he "honestly hadn't did nothing wrong." K.T., who was "operating around a fifth-grade level in reading and math," wished to retake a GED exam and wanted to provide for his two-year-old son, although he could not answer how he expected to obtain employment without an education. He said he was remorseful for the aggravated assaults he committed.

After hearing this evidence and reviewing the file, the trial court ordered K.T.'s transfer to the TDCJ.

**C.    Analysis**

The trial court orally detailed its considerations in reaching its decision. It noted that it had already placed K.T. on probation for burglary of a habitation with intent to commit assault

_____

[2]Bennett testified that K.T.'s GED testing "was not successful in all areas."

when K.T. committed the aggravated robberies. The trial court recited that, during the commission of these offenses, K.T. "took a firearm and . . . shot someone . . . and then pistol whipped them after that and then fled the scene before [being] stopped by law enforcement." The trial court noted that the TJJD dorm staff had documented that K.T. was "the individual that ha[d] the power and influence over his peers" and rejected K.T.'s blame-shifting and excuses for his behavior. After considering "the best interest of protection of the community, protection of [K.T.], and protection of others," the trial court found that K.T. had not successfully completed the programs available to assist him, would be a "time bomb waiting to go off" if released, and decided to transfer K.T. to the TDCJ.

In making the determination that K.T. should be transferred to the TDCJ, the trial court considered (1) K.T.'s character before and after commitment to the TJJD, including his character for violence and intimidation of others, (2) the violent nature of the aggravated offenses, (3) K.T.'s ability to contribute to society given his lack of education, (4) the best interests and protection of the community and K.T., (5) the recommendation and written reports from the TJJD and the prosecuting attorney, (6) the evidence from psychologists, psychiatrists, Bennett, and other individuals working with K.T., (7) K.T.'s lack of progress in treatment programs, and (8) K.T.'s refusal to take advantage of the second chance given to him by the trial court after the first transfer hearing.

We find that the record supports each of the trial court's findings, which mirror those listed in Section 54.11(k) of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 54.11(k). Comparing the trial court's findings with the statute's suggested considerations, we find that the

8

trial court clearly made its decision with reference to guiding rules and principles. As a result, we conclude that the trial court did not abuse its discretion in deciding to transfer K.T. to the TDCJ.

We overrule K.T.'s sole point of error.

**II.     Conclusion**

We affirm the trial court's transfer order.

Jack Carter
Justice

Date Submitted:     April 7, 2022
Date Decided:       April 25, 2022