**Opinion filed April 30, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00021-CV

_____

## IN THE MATTER OF G.R., JR., A JUVENILE

**On Appeal from the County Court at Law**
**Midland County, Texas**
**Trial Court Cause No. J07286**

## M E M O R A N D U M   O P I N I O N

The State filed a petition alleging that Appellant, G.R., Jr., engaged in delinquent conduct as a juvenile by committing the offenses of murder and aggravated assault with a deadly weapon. *See* TEX. FAM. CODE ANN. §§ 53.04, 53.045 (West 2022); *see also* TEX. PENAL CODE ANN. §§ 19.02(b)(1), (2), 22.02(a) (West Supp. 2024). Appellant pleaded "true" to the first allegation (the murder offense). After an adjudication hearing, the juvenile court found this allegation to be "true" and adjudicated Appellant to have engaged in delinquent conduct as alleged. Thereafter, at the disposition hearing on the same day, and pursuant to the parties' agreement, the juvenile court sentenced and committed Appellant to the

Texas Juvenile Justice Department (TJJD) for a determinate term of ten years, with the possibility of transfer to the Texas Department of Criminal Justice, Institutional Division (TDCJ-ID).

On January 25, 2024, before Appellant's nineteenth birthday, the juvenile court held a transfer/release hearing to determine whether Appellant should be transferred to TDCJ-ID to serve the balance of his sentence or released on parole supervision. *See* Fam. § 54.11. After considering the evidence presented, the juvenile court ordered Appellant transferred to TDCJ-ID to serve the remainder of his ten-year sentence.

In a single issue, Appellant contends that the trial court abused its discretion when it ordered the transfer of Appellant to TDCJ-ID instead of his release on parole supervision. We affirm.

## I. *Factual Background*

Alanna Bennett, the TJJD and TDCJ court liaison, described Appellant's conduct during his TJJD confinement. Upon his arrival at TJJD in March 2023, Appellant tested at a "second grade" reading level; however, he made "some progress" over time and eventually obtained a forklift certification. Despite this, Bennett testified that multiple incidents and referrals had been reported regarding Appellant's behavior during his commitment. According to Bennett, a referral is issued when a confined youth exhibits assaultive or disruptive behavior, which necessitates removing the youth from the general population and assigning him to TJJD's regulation and safety unit.

Three weeks after his commitment began, Appellant assaulted another inmate and received a "major rule violation" write-up. Later, to assert "his dominance," he threatened to kill another inmate and the inmate's family. Altogether, between March 2023 and January 2024, six "incidents" were reported regarding Appellant—

2

two for threatening others and disrupting scheduled activities, one for ridiculing another inmate, and two that resulted in his admission to the regulation and safety unit.

Bennett testified that Appellant has a variety of behavioral issues—refusing to follow the instructions of TJJD staff, not using respectful language when addressing TJJD staff, horseplay, failing to comply with the TJJD dress code, prolonging routines unnecessarily, being argumentative, and mistreating female TJJD staff. It was determined that Appellant needed violent offender treatment. He completed the Capital and Serious Violent Offender Program and the substance abuse treatment program (which, among other things, is designed to treat anger issues) but did not complete other rehabilitative programs. This resulted in Appellant being placed in therapeutic rehabilitation.

Bennett testified that the minimum commitment period for first-degree felony adjudication offenders who receive a determinate sentence is thirty-six months, and that, at the time she had completed her report, Appellant had been committed at TJJD for twenty-two months. *See* TEX. HUM. RES. CODE ANN. § 245.051(c)(2) (West 2013) (providing a three-year minimum period of confinement for first-degree felonies). According to Bennett, "just because a youth may not complete their mandatory minimum stay does not automatically require that TJJD make a recommendation of transfer to [TDCJ-ID]."

The results of Appellant's psychiatric evaluation indicate that he, among other things, has a history for violent behavior, poor coping mechanisms, substance abuse issues, and anger management concerns. On the other hand, evidence was presented that Appellant's behavior gradually improved during his TJJD confinement and that he was meeting academic expectations.

When making a recommendation for the transfer or release of a juvenile, Bennett testified that TJJD evaluates the overall progress of the juvenile—TJJD considers the seriousness of the adjudicated offense, the juvenile's progress in rehabilitation programs, academic progress, and overall behavior during commitment. The results of a juvenile's psychological evaluation weighs heavily because it is an objective assessment of the juvenile, and any recommendations or areas of risk that are noted in the report are considered. Bennett testified that, with Appellant, the results of his evaluation noted, in part, that "even though [Appellant] has learned the skills . . . there [has not] been enough time to really assess whether he has internalized the skill and is able to display them on a daily basis in order to control his anger once he gets into the community."

The Structured Assessment of Violent Risk in Youth (SAVRY) is used to assess a juvenile's risk to the community; the assessment covers twenty-four areas that are evaluated by a mental health professional, and once completed, the juvenile is assigned an assessment rating—the range being from low to moderate to high. Appellant's risk assessment included several areas in the "high" range—a history of violence and nonviolent offending, poor stress management, poor coping skills, exposure to domestic violence, and parental and caregiver criminal conduct— and several areas in the "moderate" range—early initiation of violence, poor academic achievement, peer delinquency, lack of personal and social support, substance abuse concerns, and anger management issues.

In articulating TJJD's recommendation, Bennett expressed concern with Appellant's threatening behavior and lack of compliance, and that Appellant continued to display the same type of behavior that had resulted in his commitment to TJJD, even though he was subject to monitoring. It was TJJD's fear that Appellant may harm others in the community if a transfer to TDCJ-ID was not ordered.

4

Therefore, she stated that TJJD's official recommendation was for the juvenile court to transfer Appellant to TDCJ-ID to serve the remainder of his sentence.

Alexander De La Rosa is Appellant's case manager; he was responsible for monitoring the progress of Appellant's academic and treatment programs and his daily behavior. De La Rosa opined that Appellant's behavior improved during his commitment. Nadine Rubio, Appellant's aunt, testified that Appellant could live with her and her husband if Appellant was released on parole supervision, and that Appellant had employment opportunities available to him.

## II. *Standard of Review*

We review a juvenile court's decision to transfer a child from TJJD to TDCJ for an abuse of discretion. *In re D.L.*, 198 S.W.3d 228, 229 (Tex. App.—San Antonio 2006, pet. denied); *In re J.D.P.*, 149 S.W.3d 790, 792 (Tex. App.—Fort Worth 2004, no pet.). In deciding whether the juvenile court abused its discretion, we review the "entire record" to determine whether the juvenile court acted arbitrarily or unreasonably—that is, without reference to guiding rules and principles. *In re T.E.G.*, 222 S.W.3d 677, 679 (Tex. App.—Eastland 2007, no pet.); *D.L.*, 198 S.W.3d at 229; *In re C.D.T.*, 98 S.W.3d 280, 283 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). There is no abuse of discretion, and we will uphold the juvenile court's decision, if the record contains some evidence to support it. *In re N.K.M.*, 387 S.W.3d 859, 864 (Tex. App.—San Antonio 2012, no pet.); *In re J.J.*, 276 S.W.3d 171, 178 (Tex. App.—Austin 2008, pet. denied). Further, there is no abuse of discretion, and we will not reverse the juvenile court's decision, simply because we may have reached a different result if the juvenile court's decision is lawful and made pursuant to its discretionary authority. *In re R.G.*, 994 S.W.2d 309, 312 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).

### III. *Analysis*

A transfer/release hearing is not a trial; rather, it is a "second chance hearing" that occurs after the juvenile court has sentenced the juvenile to a determinate term of commitment. *D.L.*, 198 S.W.3d at 230. Before a juvenile who has been sentenced to a determinant term reaches the age of nineteen, the juvenile court, upon TJJD's request, must determine whether the juvenile should be released on parole supervision or transferred to TDCJ to serve the remainder of his sentence. FAM. § 54.11; HUM. RES. § 244.014 (The TJJD may request an order approving the transfer of the juvenile to TDCJ if the sentence imposed has not been completed and the juvenile poses a continuing risk to the community's welfare.). The stringent due process requirements that are afforded a juvenile in determining the juvenile's guilt do not apply at a transfer/release hearing. *D.L.*, 198 S.W.3d at 230.

The guiding principles that govern juvenile transfer and release proceedings are provided in the Family Code. In these proceedings, in determining whether the juvenile should be released on parole supervision or transferred to TDCJ for the completion of his sentence, the juvenile court may consider several factors, including: (1) the experiences and character of the juvenile before and after his commitment to TJJD or a post-adjudication correctional facility; (2) the nature of the offense for which the juvenile was adjudicated and the manner in which the offense was committed; (3) the abilities of the juvenile to contribute to society; (4) the protection afforded the victim or any member of the victim's family; (5) the recommendations of TJJD, the county juvenile board, the local juvenile probation department, and the prosecuting attorney; (6) the best interest of the juvenile; and (7) any other relevant factor(s). FAM. § 54.11(k). The juvenile court need not consider every factor in making its determination. *J.J.*, 276 S.W.3d at 178; *R.G.*, 994 S.W.2d at 312. Further, evidence of each statutory factor is not required, and

the juvenile court may assign different weights to the factors that it does consider. *J.J.*, 276 S.W.3d at 178; *In re C.L., Jr.*, 874 S.W.2d 880, 886 (Tex. App.—Austin 1994, no writ).

In addition, the juvenile court may consider written reports from probation officers, court employees, consultants, TJJD employees, appointed guardians ad litem, employees of a post-adjudication secure correctional facility, and witness testimony. *See* FAM. § 54.11(d); *In re F.D.*, 245 S.W.3d 110, 113 (Tex. App.—Dallas, 2008, no pet.). At the conclusion of the transfer/release hearing, the juvenile court may (1) order the juvenile returned to TJJD, (2) release the juvenile on parole supervision or (3) order the juvenile transferred to TDCJ-ID for the completion of his imposed sentence. *See* FAM. § 54.11(i), (j).

Appellant argues that, in light of the above factors, the evidence presented at the transfer/release hearing weighs in favor of his release on parole rather than transferring him to TDCJ-ID. Thus, according to Appellant, the juvenile court abused its discretion when it ordered Appellant transferred to TDCJ-ID rather than releasing him on parole supervision.[1] Conversely, the State contends that, although Appellant presented "some favorable evidence" of his behavior while committed, this "favorable evidence" was rebutted with evidence of, among other things, multiple instances of Appellant's misconduct during the same time frame. As such, the State asserts that the "entire record" supports the juvenile court's decision.

Here, the record shows that favorable and unfavorable evidence was presented to the juvenile court concerning Appellant's behavior before *and* during his TJJD commitment. Because of the parties' contentions, we will discuss the application of each statutory factor in turn.

---

[1]Although the juvenile court's order recites that it considered the seven factors listed in Section 54.11(k) in making its transfer determination, we cannot ascertain the weight it attributed to each factor. *See* FAM. § 54.11(k).

A.  *Appellant's Experiences and Character Before and After Commitment*

De La Rosa testified that Appellant's behavior improved during his TJJD commitment.   Appellant avers that although he was involved in six reported "incidents" from March 2023 to January 2024, only two incidents were classified as "major" violations, and another was reported as horseplay.  Appellant claims that he could not be suffering from "volatility and rage" issues, as the State suggests, when, while committed, he was not involved in any reportable incidents 98% of the time. Further, Appellant was subject to electronic monitoring pending trial, and he did not commit any new *violent* acts during that time.

In response, the State contends that Appellant's predominate periods of positive behavior cannot overshadow and do not outweigh his many instances of assaultive and disruptive behavior during his TJJD commitment, nor does this indicate that Appellant is "rehabilitated for the most serious of offenses."

Before his commitment to TJJD, Appellant "endorsed" a lengthy history of delinquency, which included significant involvement in drugs since an early age, undocumented offenses of burglary and robbery, and his association with delinquent peers.  Further, Appellant "was introduced to [marihuana]" by an extended family member at the age of eight, and he began selling drugs when he was fourteen, which eventually led to the daily use of marihuana, monthly use of Xanax, and experimentation with cocaine.  Because a juvenile is punished when his delinquency is adjudicated, in making a "second chance" determination under Section 54.11, the juvenile court may consider the juvenile's behavior during commitment.  *D.L.*, 198 S.W.3d at 230.

After his commitment commenced, Appellant was involved in six reportable incidents—two of which involved assaultive and threatening conduct, two that involved disrupting scheduled activities, and two admissions to the regulation and

safety unit. Appellant also had ongoing issues with, among other things, complying with instructions from TJJD staff, addressing TJJD staff respectfully, complying with the TJJD dress code, engaging in horseplay, mistreating female TJJD staff, ridiculing and abusing other inmates, and being argumentative. Thus, even though, statistically, Appellant purportedly showed signs of "good behavior" during approximately 98% of his commitment term, he nevertheless engaged in a pattern of violent and unacceptable behavior in a controlled environment (TJJD), and seemingly could not control his aggression. Thus, the juvenile court could have reasonably concluded, as TJJD's recommendation to it suggests, that Appellant's misconduct outweighed his "favorable behavior" and justified its decision to transfer Appellant to TDCJ-ID, rather than release him on parole supervision. *See N.K.M.*, 387 S.W.3d at 860, 865.

B. *The Nature and Manner of Appellant's Adjudicated Offense—Murder*

Appellant contends that his psychological report clearly shows that he stabbed the victim three times only because the victim had threatened Appellant's family; therefore, he was acting in defense of his family and did not commit a "premediated" murder. According to Appellant, because he and the victim were initially bystanders to a violent encounter that was instigated by their respective family members, and because he and the victim unfortunately became involved in this "melee," Appellant's conduct is not indicative of a person who seeks revenge or promotes violence.

However, the violent nature of the offense—stabbing the victim, who was unarmed, three times—speaks for itself, which, without more, supports and weighs in favor of the juvenile court's transfer decision.

C. *Appellant's Ability to Contribute to Society*

During his TJJD commitment, Appellant contends that he completed certain vocational programs. As such, this shows that he could be a productive member of society. However, Appellant did not complete his rehabilitative programs, in part, because he did not have enough time to internalize the necessary treatment that he received during his twenty-two-month commitment.

Appellant believes that relying on his "family unit" to provide shelter, support, employment opportunities, security, and positive influence would in turn mold him into a person who could contribute to society in a meaningful way. To the contrary, the juvenile court could have reasonably concluded that any influence and guidance that Appellant's "family unit" could provide would hinder, rather than advance, Appellant's rehabilitation and path to becoming a law-abiding and productive member of society. The volatile and violent history associated with Appellant's "family unit" is not one that can be characterized as positive, and Appellant's exposure to the domestic violence, abuse, criminal conduct, gang affiliation, and drug use to which his "family unit" subscribed, suggests the risk and potential for subjecting Appellant to the same and only environment that he had known before his commitment, if he was released on parole supervision—one that is not conducive to rehabilitation. Moreover, if Appellant was released, the only living arrangement option presented was offered by Rubio, whose husband has an extensive criminal history.

D. *Protection Afforded to the Victim's Family*

Appellant contends that protecting the victim's family is unnecessary because they instigated the altercation that ultimately caused Appellant to stab the victim to protect his family from further harm. Indeed, a "brewing" conflict between Appellant's family and the victim's family was the catalyst that led to the murder.

Appellant even conceded that "there have been threats between family members before and since the [murder.]" Thus, the juvenile court could have reasonably concluded that these ongoing threats and Appellant's release would exacerbate this conflict and jeopardize the safety of the victim's family.

E. *Recommendations for Release v. Transfer*

TJJD, the Midland County juvenile probation department, and the State recommended the transfer and continued commitment of Appellant, recommendations that the juvenile court may consider in making its transfer/release determination. *See* FAM. § 54.11(k). However, Appellant contends that these recommendations were based solely on speculation.

According to Appellant, he successfully controlled his anger 98% of the time during his TJJD commitment. TJJD relied on certain findings in Appellant's psychological report, which stated that, if Appellant was released to parole supervision, residing with his father would be too risky because of the father's past abusive behavior toward Appellant. Appellant contends that such behavior is "in the distant past" because he is an adult and thus it is unlikely that his father would threaten, engage, or abuse him now. Further, Appellant successfully completed vocational training during his TJJD commitment and allegedly had alternative placement and employment opportunities available to him if released. Appellant believes that the juvenile court failed to address these considerations.

In response, the State contends that the juvenile court could have reasonably concluded that, if released to parole supervision, Appellant's familial environment would not be conducive to rehabilitating Appellant, but rather, would hinder it. Bennett stated several reasons in support of TJJD's transfer recommendation, in which the juvenile probation department and the State joined, namely, (1) the seriousness of Appellant's adjudicated offense, (2) his pattern of misconduct and

behavioral issues during commitment, (3) the results of his psychological evaluation, (4) his "moderate" and "high" SAVRY risk assessment ratings, (5) his failure to complete rehabilitative programs, (6) his history of violent behavior, (7) his lack of compliance with TJJD policies and instructions, and (8) TJJD's concern that Appellant would be a continuing threat to the community if released. Further, Appellant was associated with a high-ranking West Texas gang and his immediate family—his father, his mother, and Rubio's husband—have extensive criminal histories.

In this instance, because Appellant's transfer to TDCJ-ID was the safest and most reasonable decision under the circumstances, the juvenile court could have reasonably concluded that this joint recommendation weighed in favor of its decision to transfer Appellant to TDCJ-ID.

F. *Best Interest Determination*

Appellant asserts that the contentions he has raised regarding the other transfer/release factors negate the juvenile court's determination that it would be in Appellant's best interest to be transferred to TDCJ-ID rather than released on parole supervision. Appellant believes that he could be adequately supervised via electronic monitoring and could benefit from substance abuse counseling.

However, in addition to his misconduct and other behavioral issues, Appellant had not completed his mandatory minimum thirty-six-month term of commitment or the five stages of rehabilitation that is required of juveniles during their commitment period. Further, Appellant struggled to control his aggressive behavior while under constant supervision, antagonism remains between his family and the victim's family, and no stable living arrangements exist for him if he was released on parole supervision. Appellant has shown a disregard for authority and a lack of remorse for his actions. Therefore, the juvenile court could have reasonably

concluded that, based on the entire record, transferring Appellant to TDCJ-ID, rather than releasing him on parole supervision, is in Appellant's best interest.

## IV. *This Court's Ruling*

As we review the propriety of the juvenile court's decision, we must consider the entire record, not only portions in isolation that may be favorable to only one party. *See N.K.M.*, 387 S.W.3d at 864–65; *J.J.*, 276 S.W.3d at 178; *T.E.G.*, 222 S.W.3d at 679. Although Appellant presented some "favorable evidence" that he contends justifies his release on parole supervision, the juvenile court could have reasonably concluded that this evidence was rebutted and outweighed by Appellant's assaultive, threatening, and disruptive behavior during his TJJD commitment, his ongoing behavioral issues and refusal to comply with TJJD staff directives, the results of his psychological and psychiatric evaluations, his noncompliance with TJJD rehabilitative programs, the violent nature of his adjudicated offense, his SAVRY assessment ratings, his and his family's criminal histories, and the concerns expressed by TJJD staff. *See N.K.M.*, 387 S.W.3d at 865. The juvenile court may consider the factors it deems to be appropriate in making its determination—it need not consider *every* factor—and in turn assign appropriate weight to each considered factor. *See J.J.*, 276 S.W.3d at 178; *C.L.*, 874 S.W.2d at 886. Here, the juvenile court determined, among other things, that Appellant needed further rehabilitation, and that the welfare of the community required that he complete the remainder of his sentence at TDCJ-ID.

It was within the juvenile court's discretion to assign appropriate weight and credibility to the evidence presented. *See N.K.M.*, 387 S.W.3d at 865; *J.J.*, 276 S.W.3d at 178. In this case, we conclude that, based on the entire record, some evidence supports the juvenile court's decision. *N.K.M.*, 387 S.W.3d at 865; *J.J.*, 276 S.W.3d at 178. Thus, irrespective of the competing narratives and contentions

advanced by Appellant, we cannot say that the juvenile court abused its discretion when it ordered that Appellant be transferred to TDCJ-ID to serve the balance of his imposed determinate sentence.

Accordingly, we overrule Appellant's sole issue and affirm the order of the juvenile court.

W. STACY TROTTER

JUSTICE

April 30, 2025

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.